**Opinion filed August 12, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00267-CR

_____

### JUAN JOSE TORRES, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**
**Dawson County, Texas**
**Trial Court Cause No. 18-7964**

## M E M O R A N D U M   O P I N I O N

The grand jury indicted Appellant, Juan Jose Torres, for the first-degree felony offense of aggravated robbery of a person sixty-five years of age or older. *See* TEX. PENAL CODE ANN. § 29.03(a)(3)(A) (West 2019). The jury convicted Appellant of the charged offense and thereafter assessed his punishment at fifteen years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a $5,000 fine. The trial court sentenced Appellant accordingly

and ordered that Appellant also pay $2,001 in restitution to the victim, Marshall Lee Lauderdale. In a single issue, Appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

## I. *Factual Background*

On July 18, 2018, the victim, Lauderdale, was physically assaulted and robbed at Appellant's home in Lamesa, Texas. At the time of this incident, Lauderdale was sixty-five years of age. Lauderdale had suffered from significant health issues in recent years—three heart attacks, including one that required a quadruple bypass open-heart surgery, and a "broken" back—which had caused him to lose a significant amount of weight and necessitated his participation in an ongoing pain management program under the supervision of his treating physician. As a result of these circumstances, Lauderdale only weighed approximately ninety-five pounds at the time of the assault and would regularly undergo blood draw testing for illegal drugs as a predicate to his participation in the pain management program, which included prescriptions for opiate pain medications.

Appellant and Lauderdale provided conflicting accounts of what transpired at Appellant's house on July 18. According to Lauderdale, he went to Appellant's house to examine several handguns Appellant had offered to sell him. Lauderdale claimed that, at the time of the attack, he had only known Appellant for four or five weeks and that he had hired Appellant to perform some contract labor around Lauderdale's house—hauling trash, mowing the lawn, and similar tasks. Lauderdale paid Appellant in cash for his labor. At some point, while Appellant was working at Lauderdale's house, Appellant observed Lauderdale purchase a handgun from another person. Appellant approached Lauderdale about the possibility of purchasing handguns from Appellant, which Appellant claimed could be obtained from his brother, who lived in Lubbock. Lauderdale expressed interest in the

2

opportunity and he arranged to meet Appellant at Appellant's house to inspect the guns on hand.

Lauderdale went to Appellant's house on the afternoon of July 18; upon entering the house, a young child approached Lauderdale and asked him for a cigarette. Lauderdale refused. Immediately thereafter, Lauderdale was struck from behind, which caused him to fall to the floor. While he was on the floor, Lauderdale was repeatedly struck on his head, face, and upper body. He could partially see one of his attackers, who, he claimed, was wearing a bandana over the lower half of his face as a means of disguise. Appellant approached from another room and watched as Lauderdale was struck several more times; Appellant also hit and kicked Lauderdale with his hands and feet while Lauderdale was lying on the floor. Appellant then straddled Lauderdale and searched his pockets; Appellant removed several items from Lauderdale's person—his keys, a knife, a Leatherman, a flip phone, and $200 to $300 in cash.

After these items were taken from Lauderdale, Appellant went outside and retrieved Lauderdale's 9mm Kimber handgun from Lauderdale's pickup, which was parked in the driveway of Appellant's house. Appellant returned and struck Lauderdale several times with the butt of Lauderdale's gun, while yelling: "Where's the money?" One of the assailants also said to Lauderdale: "You crazy old white-haired m-----f----r. I believe I'm just going to kill you." Lauderdale was afraid and testified that he believed that he would be killed. Appellant and one of the assailants then picked up Lauderdale from the floor and threw him out the front door "like a sack of trash." Lauderdale was eventually able to get into his pickup. Appellant and one of the assailants threatened Appellant and told him that, if he called the police, they would kill him and his wife and burn down his house. Appellant then tossed Lauderdale the keys to his pickup, and Lauderdale drove away.

At trial, Lauderdale testified that his 9mm Kimber handgun was worth approximately $2,000. Although Lauderdale had left his wallet at his house before he went to Appellant's house, he testified that he did have $200 or $300 in cash with him. Lauderdale stated that he told law enforcement that his cash had been taken from him during the attack, but he could not remember specifically which officer he informed of this.

Appellant testified at trial and his version of events was significantly different. Appellant denied that Lauderdale came to his house to buy guns. Appellant claimed that he sold marihuana and that Lauderdale was a regular customer. According to Appellant, Lauderdale routinely purchased two pounds of marihuana from him every week. Appellant testified that this amount was more than one would expect to possess for only "personal" use. Appellant further testified that Lauderdale had expressed to him that he would smoke marihuana to deal with the effects of his heart condition.

Appellant priced his "product" at $450 per pound. Appellant stated that, during his most recent drug transaction with Lauderdale, he only had one pound of marihuana available to sell to Lauderdale; nevertheless, Lauderdale still "fronted" him $900 for two pounds. Lauderdale expressed his trust in Appellant to deliver the second pound of marihuana at a later date, in light of their previous drug transactions. However, according to Appellant, on July 15, three days before the attack, Lauderdale appeared at Appellant's house, and when Appellant approached Lauderdale's vehicle (while holding his daughter in his arms), Lauderdale brandished a handgun and pointed it at Appellant and his daughter. Lauderdale then allegedly demanded the second pound of marihuana. On the evening of July 17, Appellant received a new shipment of marihuana; however, it was too late in the evening to contact Lauderdale to deliver it. Therefore, Appellant and Lauderdale

4

agreed to meet at Appellant's house the following afternoon so that Lauderdale could pick up the second pound of marihuana.

Appellant testified that just before Lauderdale arrived at Appellant's house on July 18, an acquaintance of Appellant, Caesar Mojica, stopped by to smoke some marihuana. Caesar was still at Appellant's house when Lauderdale arrived. As Lauderdale entered Appellant's house, he told Appellant that he would "shoot up" Appellant's house if Appellant did not have the other pound of marihuana that was due him. Appellant stated that he ignored Lauderdale's threat because he had the extra pound of marihuana for Lauderdale; however, as Appellant went to another room to retrieve the marihuana, Caesar reacted to Lauderdale's threat and attacked him. Appellant then saw that Caesar was on top of Lauderdale and that he was striking Lauderdale with Lauderdale's gun. Appellant took Lauderdale's gun from Caesar because he knew Lauderdale was old and had heart problems and because he was fearful of Lauderdale's earlier threats. Contrary to Lauderdale's testimony, Appellant testified that Lauderdale did not have any cash on his person.

According to Appellant, Lauderdale threatened that, if they allowed him to get up, he intended to get one of the other guns that he had in his pickup. In response to Lauderdale's threat, Caesar took Lauderdale's pickup keys and tossed them to Appellant so that Appellant could check Lauderdale's pickup for the presence of other guns. Appellant checked Lauderdale's pickup and found two more guns. Appellant denied ever hitting or kicking Lauderdale at any time or taking any cash from him. Appellant also claimed that he gave the pickup keys back to Lauderdale and told him to leave. Appellant said that he kept Lauderdale's 9mm handgun because he was fearful of what Lauderdale would do if he regained possession of the gun.

Appellant denied that any plan had been devised to ambush Lauderdale. He also testified that those who came to his house to purchase marihuana from him

5

would park their vehicles in front of the front door to his house, at an angle, and not on the street. Appellant stated that he and Lauderdale had discussed this parking arrangement in the past.

As a result of the beating, Lauderdale sustained a black eye and numerous lacerations to his face and arms. He drove home after he left Appellant's house and told his wife what had occurred; they then called the police. Lauderdale testified that he had never purchased any illegal drugs from Appellant. According to Lauderdale, he ingests several medications and undergoes regular drug testing as part of his pain management program. Lauderdale's wife also testified and corroborated his version of events concerning how Lauderdale knew Appellant, his reasons for going to Appellant's house, his physical condition when he returned home, and his recounting of what had occurred at Appellant's house.

Officer Gabriel Flores of the Lamesa Police Department was the first responding officer to arrive at Lauderdale's house. He testified that Lauderdale appeared shaken and afraid. He noted that there were several lacerations on Lauderdale's body, and he took photographs of them. According to Officer Flores, Lauderdale told him that he had met with Appellant earlier that day and that he had purchased guns from Appellant in the past. He also told Officer Flores that he went to Appellant's house to buy guns from him and that, after he arrived, Appellant and two other men attacked and robbed him. Lauderdale told Officer Flores that one of the assailants (he was not specific as to which assailant it was) removed a pistol from Lauderdale's pickup—his Kimber 9mm—and struck him in the face with it several times. Officer Flores testified that Lauderdale told him that the two unknown assailants fled on foot and took his flip phone, his phone case, his Case knife, his Leatherman, multiple keys, and his Kimber 9mm. Lauderdale did not tell Officer Flores that he had any cash with him or that Appellant took his cash. Officer Flores testified that, to his knowledge, Lauderdale only spoke to him and Lieutenant Darrel

6

Williams. According to Officer Flores, Appellant was eventually arrested pursuant to an unrelated warrant. Although Appellant was questioned about this incident, he denied any involvement in it.

Lieutenant Darrel Williams of the Lamesa Police Department also responded to Lauderdale's 9-1-1 call. Lieutenant Williams obtained a written statement from Lauderdale after his initial interview with Officer Flores; Lieutenant Williams noted that, by then, Lauderdale was calm. According to Lieutenant Williams, Lauderdale told him that he was kicked by one of the other assailants, not by Appellant; that Appellant and a stranger checked his pockets; and that Appellant thereafter took the keys to Lauderdale's pickup, went outside to his pickup, and removed a gun from his pickup. Although Lieutenant Williams' report noted that Lauderdale had known Appellant for five years, Lauderdale testified that Lieutenant Williams made an incorrect entry, because Lauderdale had only known Appellant for approximately five weeks before he was attacked at Appellant's house. Lieutenant Williams eventually interviewed Appellant in April of 2019, after Appellant had retained counsel, and Appellant recounted the same version of events to which he testified at trial.

Before he was arrested, Appellant left Lauderdale's 9mm Kimber handgun in a bag at his uncle's house, after he had attempted to sell it to him. Later, while confined in the county jail, Appellant called his mother, Sophia Cuellar Mandujano, several times and asked her to retrieve the bag from his uncle's house and to keep it for him, which she did. Appellant also called his sister, Stephanie Torres, while he was in jail and asked her to pick up the 9mm handgun from their mother. Because Appellant was confined when these telephone calls were made, the calls were recorded by law enforcement and later admitted into evidence at trial. Stephanie retrieved the 9mm handgun and kept it in a safe at her house in Lubbock. Soon thereafter, Sophia and Stephanie were contacted by law enforcement, and a detective

7

from the Lubbock Police Department visited Stephanie's home. During this meeting, Stephanie gave the 9mm handgun to the detective.

## II. *Standard of Review – Sufficiency of the Evidence*

In his sole issue, Appellant contends that the evidence presented at trial is insufficient to support his conviction for aggravated robbery. Specifically, Appellant asserts that, contrary to Lauderdale's version of events, Lauderdale was at Appellant's house to buy marihuana from Appellant, not guns, and that Lauderdale threatened Appellant with a gun. According to Appellant, although his companion—Caesar—had attacked Lauderdale, Appellant did not attack or assault Lauderdale in any manner, and he confiscated Lauderdale's gun solely for his own protection because Lauderdale had threatened him with it.

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded.

*Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

A person commits the offense of robbery if, in the course of committing theft[1] and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. PENAL § 29.02(a)(1) (West 2019). The offense becomes an aggravated first-degree felony if, during the commission of the robbery, the person causes bodily injury to another person who is sixty-five years of age or older. *Id.* § 29.03(a)(3)(A). Bodily injury is defined as "physical pain, illness, or any impairment of physical condition," *id.* § 1.07(8), and Texas courts have broadly construed this definition to include "even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989). In the context of an aggravated robbery, bodily injury occurs when "violence is clearly perpetrated against another for the purpose of . . . preventing or overcoming resistance to theft." *Id.* at 787 (internal quotation marks omitted). In this case, the indictment alleged that Appellant caused bodily injury to Lauderdale by kicking him and striking him with a firearm.

It is undisputed that Lauderdale was sixty-five years of age at the time of the offense and that he suffered bodily injury. Nevertheless, what is disputed, *inter alia*, is whether Appellant was involved in the infliction of bodily injury upon Lauderdale. Here, the State adduced evidence that Lauderdale went to Appellant's house to look at some guns that Appellant had available for sale. Lauderdale testified that he was ambushed and attacked by Appellant and other assailants shortly after he entered Appellant's house. Lauderdale testified that Appellant struck him in the face with the butt of Lauderdale's 9mm Kimber handgun and that Appellant kicked him repeatedly while he was lying on the floor. He further testified that Appellant

---

[1]A person commits the offense of theft when he unlawfully appropriates property with the intent to deprive the owner of said property. *See* PENAL § 31.03(a).

10

removed and kept the contents from Lauderdale's pockets—a phone, cash, a pocketknife, and a Leatherman—and then took his 9mm Kimber handgun. According to Lauderdale, he feared for his life. This evidence, without more, is sufficient to support a conviction for the charged offense of aggravated robbery of a person sixty-five years of age or older.

As we discussed above, Appellant denied Lauderdale's version of events and advanced an alternative view of the facts that depicted a substantially different scenario. Undoubtedly, the testimony and the evidence presented by Appellant and Lauderdale provided conflicting accounts as to essentially every detail of what had occurred on July 18. No other witnesses to these events testified. Because of the numerous inconsistencies in the evidence presented at trial, the jury was authorized to believe all, some, or none of any witness's testimony. *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899.

When, as in this case, the evidence conflicts, the applicable standard of review requires that we presume the jury resolved any conflicts in favor of the verdict, and we defer to the jury's determination in that regard. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. It is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. It is not our role or function to engage in or make credibility determinations. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778; *Sanders v. White*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). Therefore, we resolve any conflicting inferences that are supported by the record in favor of the jury's determinations. *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

Consistent with the applicable standards of review, we have carefully reviewed all of the evidence in the light most favorable to the jury's verdict. Irrespective of Appellant's contentions, we find that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of the offense of aggravated robbery as charged in the indictment. Accordingly, because sufficient evidence supports Appellant's conviction for the charged offense, we overrule Appellant's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

August 12, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).
Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.